**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| BYRON RODERICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-02201-TWP-MPB |
| | ) | |
| BRC RUBBER AND PLASTICS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND**
**DENYING PLAINTIFF'S MOTION FOR LEAVE TO SUBMIT NEW EVIDENCE**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant BRC Rubber & Plastics, Inc. ("BRC") (Filing No. 34). Also pending before the Court is a Motion for Leave to Submit Newly Discovered Evidence in Opposition to Defendant's Motion for Summary Judgment filed by Plaintiff Byron Roderick ("Roderick") (Filing No. 39). Roderick filed this lawsuit after he felt he had experienced discrimination and harassment based on his sexual orientation at BRC, his former place of employment. In his Amended Complaint, Roderick asserts a claim for sex discrimination and harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). For the following reasons, Roderick's Motion to submit new evidence is **denied** and BRC's summary judgment motion is **granted**.

## I.   BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Roderick as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

BRC is a rubber and plastic injection molding company that operates a manufacturing plant in Hartford City, Indiana, where it makes rubber injection molding for the automotive industry (Filing No. 34-2 at 2). After working at BRC for twenty-three years Roderick resigned his employment at BRC on June 1, 2017, alleging discrimination and harassment based on his sexual orientation. Roderick is an openly gay male, and during his employment at BRC, most of the employees were aware that he is gay (Filing No. 34-1 at 2, 5, 8).

Roderick began working at BRC on November 10, 1993 as a press operator. About six months later, he moved into the position of lead quality employee on the day shift in the quality department at BRC's Hartford City plant, where he remained for most of his of employment. The quality department day shift consisted of two individuals auditing parts on the floor and three individuals in the office, which included Roderick in the office. Linda Overmyer ("Overmyer") was Roderick's supervisor for nine years in the quality department. *Id.* at 5–6.

For several years, Roderick had workplace attendance problems. BRC provided multiple warnings to Roderick about his attendance. On June 18, 2010, Roderick was given a warning for a second time of being absent without calling in. A month later, on July 23, 2010, he received another warning for absences. Three days later, on July 26, 2010, Roderick received yet another written warning for attendance problems. On August 18, 2010, he received a final written warning for his absences and was notified if he accumulated three more attendance points he would be terminated. On September 10, 2010, Roderick received a warning that he had accumulated another attendance point. *Id.* at 23–24, 90–94. The following year, Roderick received a "verbal warning" on February 9, 2011, for again accumulating eight points on his attendance record. He continued to receive warnings about his workplace attendance issues in 2013 and 2014 (Filing No. 34-1 at 95–100).

Roderick admits that in 2016 and 2017, his attendance was "horrible." (Filing No. 34-1 at 23.) He received further warnings about his attendance problems on August 2, 2016, September 6, 2016, November 22, 2016, and March 8, 2017. *Id.* at 24, 102–04, 106.

On March 8, 2016, Roderick received a warning for laughing at an employee who had made a mistake, which made the employee feel embarrassed and stupid. *Id.* at 101. On January 26, 2017, he received a warning for eating on the production floor. *Id.* at 105.

In August 2016, Roderick had a meeting with Dave Laspas ("Laspas"), BRC's operations manager, and Mary Conden ("Conden"), BRC's human resources manager (Filing No. 34-1 at 10–11; Filing No. 34-2 at 3). The meeting was held to address a complaint made by another BRC employee who alleged that Roderick was messaging his girlfriend about the possibility of making a sex video for money. In the meeting with Laspas and Conden, Roderick denied that his messages had anything to do with making a sex video, and Roderick rationalized that what happened outside of work hours was none of BRC's business (Filing No. 34-3 at 2; Filing No. 34-2 at 5; Filing No. 34-1 at 10–11).

Conden and Overmyer (Roderick's direct supervisor) had already met with Roderick regarding the incident, and he had told them that what happened outside of work hours was none of BRC's business, so Laspas and Conden decided to meet together with Roderick after the initial meeting between Roderick and Conden and Overmyer (Filing No. 36-2 at 2; Filing No. 34-2 at 3–4). When Roderick explained to Laspas and Conden that his conduct outside of work hours was not BRC's concern, they clarified that Roderick represented BRC at all times, even outside of work hours, and he acknowledged understanding their position and explained that he would block the other BRC employee and his girlfriend on Facebook (Filing No. 34-1 at 11). During the meeting,

Roderick also was counseled about his poor attendance, which they explained was affecting his overall performance, and he was encouraged to make a concerted effort to improve his attendance.

In 2016, Chuck Chaffee ("Chaffee"), BRC's owner and CEO, and other members of BRC's management team were aware of poor performance and other problems in the quality department at the Hartford City plant. BRC management asked Laspas, as the operations manager, to take any corrective action necessary to improve the Hartford City quality department (Filing No. 34-5 at 1). There were numerous, ongoing discussions with Overmyer, the manager of the quality department, about communication issues and other issues that were affecting the whole department (Filing No. 34-1 at 9).

After the August 2016 meeting, Laspas began assigning new tasks to Roderick. The team members in the quality department, including Roderick, were informed during a meeting that Laspas was taking over the day-to-day operations of the department because of the ongoing issues in the department. Laspas had one-on-one meetings with each member of the quality department and planned to have additional one-on-one meetings every thirty days. Laspas and Conden had discussions with team members of the quality department throughout 2016 concerning the ongoing problems in the department (Filing No. 34-1 at 9–10; Filing No. 34-2 at 5; Filing No. 34-3 at 5).

In September 2016, Roderick met with Laspas, Conden, and Overmyer to discuss how Roderick's work performance had not improved. Roderick was counseled that his performance needed to improve, he needed to report safety issues, and he needed to assist other employees when requested. After the meeting, Overmyer told Roderick that she did not have a problem with his work performance, but Roderick knew that Overmyer also was being counseled (Filing No. 34-1 at 12–13).

On October 21, 2016, Roderick again met with Laspas, Conden, and Overmyer. Laspas told Roderick that he was frustrated with Roderick's performance despite numerous coaching sessions. Laspas also told Roderick that Roderick had shown a lack of commitment, desire, and interest in performing his assigned duties. Laspas informed Roderick that these matters needed immediate attention, and he placed Roderick on a performance improvement plan, of which Roderick received a copy. Laspas told Roderick that he had never seen anyone successfully complete a performance improvement plan, but Laspas would be there for Roderick if he needed help. *Id.* at 14, 15, 88.

After approximately thirty days, Laspas informed Roderick that Roderick had not complied with his performance improvement plan, and BRC was moving him out of the quality department and returning him to production. BRC gave Roderick the option of taking a job as a press operator or an inspector/finisher. BRC also gave Roderick the choice of any shift, and Roderick chose to be an inspector/finisher on the third shift. Other employees in the quality department also were moved to other positions. Near the end of 2016, Overmyer was demoted in the quality department from the position of quality manager to quality engineer. Around that same time, Vicky Brinker ("Brinker"), another employee in the quality department, had been receiving counseling because of work performance issues, and BRC removed Brinker from the quality department because of her work issues. Overmyer and Brinker were the two other employees who worked with Roderick in the office of the quality department. Roderick explained that nobody wanted to deal with Laspas because he was tough on everybody and threatened to walk people "out the door" (Filing No. 34-2 at 7; Filing No. 34-1 at 15–17).

On December 1, 2016, Roderick sent an email to BRC's owner, Chaffee, to "inform [him] of [Roderick's] feelings concerning his current situation" following his "recent demotion." (Filing

No. 36-4 at 14.) Roderick complained that he had been "meticulously criticized for every effort [he had] put forth," which made him feel "increased anxiety due to the hostile environment that has been created by this situation." *Id.* Roderick's email to Chaffee concluded, "Dave Laspas has threatened to walk employees out the door, myself included. So I try to avoid him." *Id.*

Chaffee called Roderick after receiving the email and explained to Roderick that BRC management had asked Laspas to restructure the quality department as needed to help the company. Chaffee told Roderick that he would look into the issue and then ask the company president and human resources manager to review the issue (Filing No. 34-5 at 1–2; Filing No. 34-1 at 18, 20).

On December 5, 2016, the human resources manager met with Roderick to discuss his concerns. Roderick told him that he was being harassed, he was upset with the whole situation, and he was upset with "the way Dave has done people" by his threatening behavior and threatening people to walk them out (Filing No. 34-1 at 19; Filing No. 34-6 at 1–2). Roderick did not tell the human resources manager that he had been singled out by Laspas, but rather, that Laspas treated all BRC's employees poorly (Filing No. 34-6 at 2).

On December 8, 2016, Roderick met with the human resources manager, the plant manager, and the new quality department manager. Roderick was offered an opportunity to return to the quality department during the day shift with a fresh start, to resume the document control function that Roderick previously had performed, and to receive his pay at his previous level. Roderick was told he still would have to deal with Laspas even though he worked a different shift because Laspas, as the operations manager, ultimately was in charge of the facility. BRC made this offer after internal discussions because Roderick had been a long-time employee, he had expressed a desire to remain in the quality department, and BRC believed that Roderick might be

able to improve his performance with the new manager in the quality department. The choice whether to return to his previous position and pay or to remain on third shift was left up to Roderick. Roderick told them that he wanted to remain on third shift so that he could avoid Laspas. After the December 8, 2016 meeting, neither the human resources manager nor any other employee of BRC received any further complaints from Roderick concerning Laspas (Filing No. 34-1 at 21–22; Filing No. 34-6 at 2).

Roderick's work hours on the third shift were 11:00 p.m. to 7:00 a.m. Laspas generally worked from 6:00 a.m. to 4:30 p.m. On occasion, Laspas would come in at 5:00 a.m. or 6:00 a.m. because he was working on a new system for BRC. While Roderick was working on the third shift, between January 2017 and June 1, 2017 (when Roderick quit his job at BRC), Laspas went out of his way to walk by Roderick a total of three times and said Roderick's name and nothing else. Laspas walked through all areas of the plant because he was the operations manager. Roderick acknowledged that Laspas did nothing else toward him from January through June 2017 other than the three occasions when Laspas walked by and said Roderick's name (Filing No. 34-1 at 25–26; Filing No. 34-2 at 8).

On June 1, 2017, Roderick called and left a voicemail message on the employee call-off number, stated his name and clock number, and then stated, "I quit." He then stated, "Just to refresh your memory, I quit." (Filing No. 34-1 at 24–25.)

BRC has a zero-tolerance policy of harassment in the workplace. Roderick was aware of the harassment policy, which was included in the employee handbook. He received, reviewed, and signed the harassment policy multiple times during his employment at BRC. Roderick also acknowledged that his employment with BRC was at-will and could be terminated at any time for

any reason or no reason at all by either BRC or Roderick (Filing No. 34-1 at 6–7, 27–31, 39–41, 84–86).

BRC's zero-tolerance policy of harassment explained:

> WE CANNOT HELP YOU OUT UNLESS WE ARE MADE AWARE THAT OUR ASSISTANCE IS REQUIRED.
>
> In fulfilling the commitment of BRC to maintain a safe and productive environment, all managers and supervisors are expected to halt any harassment or potentially threatening behavior of which they become aware by restating this policy -- and, when necessary, by direct disciplinary action reasonably calculated to eliminate a recurrence of the situation. MAKE NO MISTAKE -- HAVING TO PUT UP WITH ANY FORM OF HARASSMENT OR THREATENING BEHAVIOR IS NOT A PART OF ANYONE'S JOB AT BRC.

(Filing No. 34-1 at 27.) (Emphasis in original.)

Roderick filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and alleged in his charge:

> I am an openly gay Male. I began my employment with BRC Rubber and Plastics on November 10, 1993. I was placed on a Performance Improvement Plan by Operations Manager Dave Laspas on October 21, 2016, and on November 11, 2016, I was notified of my demotion from Quality to Production. I currently work 3rd shift in order to avoid harassment from Laspas, and have complained of the harassment to company CEO Chuck Chafee. I sometimes have anxiety attacks on the job when Laspas is near me.
>
> I believe I have been harassed and disciplined because of my sexual orientation, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Filing No. 1-1 at 6.)

On June 27, 2017, Roderick filed a *pro se* complaint in this Court, asserting a claim for discrimination and harassment based on sexual orientation under Title VII (Filing No. 1). After retaining counsel, an Amended Complaint was filed asserting a Title VII claim for sex discrimination and harassment (Filing No. 25). Soon thereafter, BRC filed a Motion for Summary Judgment.

## II.     SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

9

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Roderick as the non-moving party and draws all reasonable inferences in his favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

### III.    DISCUSSION

BRC asks for entry of summary judgment on Roderick's sole Title VII claim, and Roderick asks the Court for leave to submit "newly discovered evidence" in opposition to BRC's Motion for Summary Judgment. The Court will first address Roderick's Motion for Leave and then turn to BRC's Motion.

#### A.    Roderick's Motion for Leave to Submit Newly Discovered Evidence

On September 14, 2018, Roderick filed a motion, requesting leave to submit "newly discovered evidence"—an affidavit of a former employee of BRC that was executed on September 13, 2018 (Filing No. 39). The entirety of the Motion states:

1. An Affidavit of a former employee of Defendant, Bernie Conley, was executed on September 13, 2018.

2. Counsel for Plaintiff was advised on September 13, 2018 of this new evidence.

3. Counsel for Plaintiff has attached the Affidavit of Bernie Conley hereto and marked it as Exhibit 5.

4. Counsel for Plaintiff is in the process of verifying this evidence.

5. Defendant will not be prejudiced by the Court granting this Motion.

*Id.* at 1.

Attached to Roderick's Motion is a two-page, handwritten "affidavit" from Bernie Conley, who alleges that, on unspecified dates, Laspas made derogatory remarks containing homosexual slurs to him on two separate occasions, outside the presence of Roderick. (Filing No. 39-1.)

BRC opposes Roderick's Motion for Leave to Submit Newly Discovered Evidence, asserting that it is untimely and prejudicial as well as irrelevant. BRC explains discovery closed in this matter on July 2, 2018. Then on July 30, 2018, BRC filed its Motion for Summary Judgment. Roderick filed his response brief and evidence on August 20, 2018. On August 24, 2018, BRC filed its reply brief. Thus, the Motion for Summary Judgment is fully briefed and is ripe for ruling. Then on September 14, 2018, after discovery had closed and the dispositive motion was fully ripe, Roderick filed his Motion to submit the handwritten affidavit from Bernie Conley. BRC points out that Bernie Conley was never listed on Roderick's preliminary witness list or his final witness list. Further, Roderick does not even attempt to give a reason as to why this "new evidence" was not known earlier and could not have been discovered and produced during discovery if reasonable diligence had been used.

BRC asserts that allowing such evidence would be unfairly prejudicial to BRC because the dispositive motion is already fully briefed and ready for ruling, discovery has long since closed, and the witness was never disclosed, so discovery would have to be reopened to allow BRC to depose the new witness, thereby delaying the litigation. The Court agrees with the points raised by BRC. Roderick has not explained why the evidence could not have been produced timely, and to allow the late submission of the affidavit would result in unfair prejudice. Accordingly the motion is **denied**.

That said, even if submitted timely, this information would not support Roderick's claims because there is no evidence concerning when the statements were made, no evidence that Conley told Roderick about the statements and Roderick fails to show any harm suffered as a result of the supposed statements. See *Whittaker v. Northern Illinois University*, 424 F.3d 640, 645 (7th Cir. 2005). In *Whittaker*, explicit, derogatory and sexist references were made outside of Whittaker's presence, and there is no evidence that she was aware of the remarks during her employment. The court held that an objectively hostile work environment will not be found where "[m]ost of the conduct that forms the basis of [a plaintiff's] claim consists of derogatory statements made by supervisors or co-workers out of her hearing. " *Id*.

### B. BRC's Motion for Summary Judgment

In its Motion for Summary Judgment, BRC asserts that Roderick has no evidence to support a Title VII claim for sex discrimination and harassment. Because there is no evidence to support a claim of sex discrimination and harassment, BRC argues that it is entitled to summary judgment. In his response brief opposing the summary judgment motion, Roderick states,

> Laspas created a hostile work environment until such time as Plaintiff resigned in June of 2017. Roderick did not file a claim with the EEOC regarding the cessation of his employment, nor is he making such a claim in this action. Rather, this action is limited to the harassment and hostile work environment Roderick experienced from the date of his meeting with Laspas in August 2016, regarding the personal text messages to Amanda McJury, through the end of his employment in June of 2017.

([Filing No. 36 at 1](#)–2.)

In light of Roderick's clarification of his claim, the Court limits its analysis and discussion to the claim that Roderick suffered harassment and a hostile work environment at BRC from August 2016 until June 2017 when he resigned.

In order to support a Title VII claim of sexual harassment, the plaintiff must provide evidence that: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment she complained of was based on her sex; (3) the conduct was either severe or pervasive; and (4) there was a basis for employer liability." *Passanti v. Cook County*, 689 F.3d 655, 664 (7th Cir. 2012). For harassment to be actionable under Title VII, the conduct must be "so severe or pervasive as to alter the conditions of [] employment and create an abusive working environment." *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012) (internal citation and quotation marks omitted).

Concerning the allegation that Roderick suffered harassment and a hostile work environment at the hands of Laspas after the August 2016 meeting concerning Roderick's personal messages to a coworker's girlfriend, BRC asserts that there is no evidence that Roderick was harassed on the basis of his sexual orientation. The meeting had nothing to do with Roderick's sexual orientation nor is there any evidence that anyone at the meeting discussed Roderick's sexual orientation. Instead, the meeting addressed a complaint made by another BRC employee about Roderick's discussions with his girlfriend.

BRC argues that Title VII is not "a general civility code," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and Roderick must connect the alleged harassment or hostile work environment to his protected status. To bolster its argument, BRC points to the Seventh Circuit's decision in *Patton v. Indianapolis Public School Board*:

> A plaintiff may also establish a Title VII violation by proving that discrimination based on race or gender has created a hostile or abusive work environment. [Plaintiff] claims that [her supervisor] treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work . . . [and] subjected her to stern and severe criticism. . . . Many employees have to put up with some amount of rude, arrogant, or boorish behavior at work . . . .

> [Plaintiff] has presented no evidence to show that [the supervisors']
> treatment of her was based on her race or gender--she argues instead that the
> abusive conduct was purely personal. This is fatal to her claim. Under Title VII, a
> hostile work environment exists only when the victim was singled out because of
> his or her gender or race. Title VII does not guarantee a utopian workplace, or even
> a pleasant one. As long as the hostility was not based on a protected characteristic,
> Title VII is not implicated.

*Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (internal citations and punctuation omitted).

BRC points to Roderick's testimony to multiple people that Laspas treated everyone poorly, not just Roderick. This is evidence that Laspas was not singling out Roderick because of his sexual orientation. BRC notes that all three office staff in the quality department—Roderick, Overmyer, and Brinker—were counseled and eventually demoted or moved to other positions after Laspas took over the day-to-day operations of the quality department. This is further evidence that Laspas was not singling out Roderick because of his sexual orientation.

In performance reviews, Roderick felt that Laspas was overly critical of his performance and that Laspas was rude to all the employees and critical of the department's performance. Roderick expressed that he felt harassed because Laspas watched him perform his work responsibilities on a handful of occasions. But as BRC explains, Laspas had every right to observe the employees working in his capacity as the operations manager. Once Roderick began working the third shift, his contact with Laspas was very limited, and Roderick complained that over a six-month period Laspas walked passed him on three occasions and said his name and nothing else. BRC argues that this conduct is not severe or pervasive harassment, and there is no connection between the conduct and Roderick's sexual orientation.

BRC further asserts that Roderick never stated in his email to Chaffee, during his telephone call with Chaffee, or during or after his meetings with the human resources manager that he was

14

being discriminated against or harassed because of his sexual orientation. BRC argues there simply is no connection between Roderick's sexual orientation and what occurred at BRC and what was communicated at BRC, and as such, Roderick's harassment and hostile work environment claim fails as a matter of law.

Responding to the Motion, Roderick argues that Laspas' attitude toward Roderick changed following the August 2016 meeting, where they discussed Roderick's messages to a coworker's girlfriend. He asserts that, after the meeting, Laspas pursued a program of harassment aimed at forcing him to quit his job.

Roderick explains that in August 2016 Conden and Overmyer already had met with him to discuss his messages to a coworker's girlfriend. Shortly thereafter, Laspas decided to call a second meeting to discuss the messages. Roderick asserts that this second meeting had nothing to do with his work performance and dealt strictly with conduct that occurred outside of work hours. Following this meeting with Laspas and Conden, Roderick was assigned additional work assignments, and Overmyer (Roderick's direct supervisor) was directed to report weekly to Laspas on Roderick's work performance. Laspas was critical of Roderick's work performance and frequently asked for status updates on projects. Laspas placed Roderick on a performance improvement plan and told him that he had never seen anyone successfully complete it. (Filing No. 36-4 at 5). As predicted and forewarned, Laspas decided that Roderick did not meet the plan's requirements and demoted him to a production position. Roderick argues that Laspas would go out of his way to walk by him in order to intimidate him. He further argues that BRC offered no evidence that his coworker was threatened by his personal messages to the coworker's girlfriend, and the harassing conduct by Laspas did not begin until after Laspas confronted Roderick about the private messages sent to the girlfriend concerning a sex tape.

In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger v.New Venture Gear, Inc.,* 361 F.3d 965, 975–76 (7th Cir. 2004). Indeed, the threshold for plaintiffs is high, as "[t]he workplace that is actionable is one that is 'hellish." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir.1997). Unfortunately for Roderick, his evidence and argument does not satisfy the necessary elements to support his harassment claim. The evidence falls well short of showing an objectively and subjectively offensive work environment, harassment based on sexual orientation, severe or pervasive harassing conduct, and a basis for employer liability. *See Passanti*, 689 F.3d at 664.

All three office staff in the quality department, which included Roderick, were counseled and demoted or moved to other positions when Laspas took over the day-to-day operations of the quality department. A new quality department manager was brought in to correct performance problems in the department. Roderick complained to many people, and acknowledged in his deposition, that Laspas treated everyone poorly and that nobody wanted to deal with Laspas because he was tough on everybody and threatened to walk people out the door. When he complained to Chaffee and the human resources manager, Roderick reported that Laspas was overly critical, harassing, and rude, but he never raised his sexual orientation, nor did he make the connection between Laspas' conduct and Roderick's sexual orientation.

Under Title VII, a hostile work environment exists only when an employee is singled out because of his protected status. "Title VII does not guarantee a utopian workplace, or even a pleasant one. As long as the hostility was not based on a protected characteristic, Title VII is not

implicated." *Patton*, 276 F.3d at 339. The designated evidence shows that Title VII is not implicated in this case, and as such, the Court **grants** BRC's Motion for Summary Judgment.

## IV.     CONCLUSION

For the foregoing reasons, Defendant BRC Rubber & Plastics, Inc.'s Motion for Summary Judgment is **GRANTED** (Filing No. 34), and Plaintiff Byron Roderick's claim is dismissed. Roderick's Motion for Leave to Submit Newly Discovered Evidence (Filing No. 39) is **DENIED**. All other pending motions are **denied as moot**, and the jury trial is **vacated**. Final judgment will issue under separate order.

**SO ORDERED.**

Date:  8/20/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Christopher E. Clark
GOODIN ABERNATHY LLP
cclark@goodinabernathy.com

Thomas M. Kimbrough
BARRETT & MCNAGNY LLP
tmk@barrettlaw.com

Michael H. Michmerhuizen
BARRETT & MCNAGNY LLP
mhm@barrettlaw.com